ORDERED in the Southern District of Florida on  JUL 15 2008

A. Jay Cristol, Chief Judge Emeritus
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

RE:

PATRICIA JEAN LLOYD,

Debtor.

CASE NO.: 07-13502-BKC-AJC

Chapter 7

### MEMORANDUM ORDER OVERRULING CREDITOR'S OBJECTION TO DEBTOR'S CLAIMED EXEMPTION OF HOMESTEAD

THIS CAUSE came before the Court for an evidentiary hearing upon creditor/interested-party Michael Mabe's ("Creditor") Objection To Debtor's Claim of Homestead Exemption ("Objection") [CP# 60]. This is a Chapter 7 case in which the Debtor, Patricia Jean Lloyd ("Debtor"), has listed and claimed as exempt under Florida's homestead law, certain real property and improvements located in Key West, Monroe County, Florida. The Creditor objects to the Debtor's claim of exemption, contending that the Debtor abandoned her Florida homestead when she leased the subject

real property and moved to California in February of 2003. The issue before the Court is whether the Debtor is entitled to exempt the Key West property, or whether her claim of exemption cannot stand because she abandoned the Key West property as her homestead – allowing the Creditor's judgment lien to attach. The Court, having heard the sworn testimony of the Debtor and several other witnesses, having reviewed the post-hearing memoranda and submissions of the parties, and having reviewed the pleadings and records on file, enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The material facts relevant to the Court's determination of abandonment are largely undisputed, and were established during an evidentiary hearing from testimony and uncontradicted documents of record in the case.

Debtor was born in California but declares here legal residence in FL. She currently lives in Seal Beach in a rented duplex, on a month to month basis. The duplex was leased in August 2006. The Debtor has 2 children; son Christopher is now 18 years old and attends a California college, and Marissa is Debtor's 14 year old daughter over whom she has sole custody. Marissa lives in California with the Debtor and Christopher.

The Debtor is the owner of a parcel of real property located on Big Coppitt Key, Key West, Florida ("Key West Property"). She also rents a storage facility in Key West. The Key West Property has a trailer/mobile home permanently affixed to it. The Debtor obtained the Key West Property from her mother by quit-claim deed in July of 2000. Prior to obtaining title to the Key West Property, the Debtor lived on the Key West Property for many years with her now ex-husband, and their children.

2

In February of 2003, the Debtor and her minor children moved from Key West, Florida to Duarte, California to live with Barry Mullen, the Debtor's high school sweetheart/now ex-boyfriend, in his California home. The Debtor enrolled her two children in school in California, opened bank accounts in California and obtained a California driver's license. The Debtor also registered to vote in Los Angeles County, California, using the Duarte, California address as her domicile/principal residence, and executed a sworn affidavit/registration form to that effect. The Debtor did not, however, surrender her Florida voter's registration card.

In April of 2003, the Debtor retained a real estate broker who leased the Key West Property to a family for $1,100.00 per month for a term of one year. In October of 2003, the Debtor retained a real property management company who evicted the family for non-payment of rent. From her testimony, it appears the Debtor subsequently rented the property again after the eviction, but the specific dates of rental were not established.

While she was living in California, the Debtor testified that she came and went to Key West. One time, in 2004, the Debtor and Mr. Mullen, a contractor by trade, traveled to Key West, with one of his employees, to make improvements and modifications to the Key West Property. The Debtor submitted various hotel bills as evidence of her many trips to Key West, as she stayed at hotels in the Key West area when she visited because the Key West Property was being leased.

Around July of 2005, the Debtor's relationship ended, and she and her minor children moved in with her mother, remaining in California. She purchased an automobile, and insured the automobile using her Key West address.

On August 30, 2005, the Creditor domesticated and attached his initial judgment lien against the Key West Property.

In October of 2005, Hurricane Wilma blew through the Florida Keys and caused flood damage to the Key West Property. The Debtor testified she was in Key West during Hurricane Wilma. The Debtor's tenant at the time was displaced from the mobile home on the Key West Property, and lived for some time in his boat located on the front lawn of the Key West Property. The Debtor attempted to clean up the property damage, placed a new utility pole on the property, and obtained a temporary trailer from the Federal Emergency Management Agency ("FEMA") for placement on the Key West Property. The Debtor did not reside on the Key West Property after the hurricane damage.

The Debtor placed the Key West Property on the market for sale after the hurricane as it was unliveable. She testified that she was not able to afford living in Key West, especially after the hurricane, and expressed that it was easier for her to earn a living in CA. The Debtor stated that it was her intention to go to California to work, but that she always intended to return to Key West. She testified that she had plans and hopes to build a new home on the Key West Property. She further testified that she has never declared any other property to be her homestead, other than the Key West Property. The Debtor maintains a rental unit at a storage facility in Key West. The Court finds the Debtor to be a credible witness in her own behalf, and her testimony was unrebutted.

The Debtor's former husband testified that he lived in Key West with the Debtor in 1994, but that they lived in several other places too during their 15 year marriage, including California and Galveston. He stated that the Debtor always hated living in Florida, because it was too hot. On cross-examination, he admitted that after their divorce in 1995, the Debtor continued to live in Florida. The Court finds the former husband is a disgruntled witness who owes the Debtor child support in the amount of approximately $18,000.00. He stated that he was testifying in court

because he believed the Debtor cheated him out of property. The Court places zero value on this witness' testimony.

Several other witnesses appeared on behalf of the Debtor, all of whom were credible and all of whom provided testimony supporting that of the Debtor:

1) Vickie Ann Silcox is a friend and business acquaintance of the Debtor's. Ms. Silcox is a painter who lives in California and she knows the Debtor from art shows. It is her understanding that the Debtor has a home in Florida and rents an apartment in CA.

2) Sandy Guthrie lives in Key West and has known the Debtor for about 5 years. She gave the Debtor $15,000.00 approximately four (4) years earlier to teach her the craft of bottle-making and to acquire the Debtor's business. Sandy Guthrie stated it is her understanding the Debtor lives in Key West, but she moved to California to be with her boyfriend. She testified that the Debtor did not move to California permanently and stated that the Debtor was coming and going to and from Florida while she was living with her boyfriend in CA.

3) Leonard Aguire lives in California and housed the Debtor after the hurricane. He testified that the Debtor travels to California for business but that her permanent home was here in Florida. He also testified the Debtor told him that she lost her house in a hurricane and was making money to fix it up.

4) Alan McReynolds has known the Debtor for about 15 years from the Keys. He testified that the Debtor owned a place in the Keys and was staying in California temporarily to earn money, as she could not make a living in Florida after the hurricane. He testified that, for most of the 15 years he has known her, the Debtor has lived in FL.

Finally, the Debtor's former boyfriend, Barry Mullen, testified. He testified the Debtor lived

with him from February 2003 through July 2005. He further testified that he and the Debtor went to Florida for vacation twice, once to fix up the Key West Property and the other while on their way to a cruise out of Florida with his parents. They stopped in Key West to visit the Key West Property, but they stayed in hotels because the trailer on the Key West Property was rented. He stated that he claimed the Debtor's children as dependents on his tax returns for 2 years, in 2003 and 2004.

From the evidence submitted, it appears the Debtor claimed her children as dependents in her 2004 and 2005 tax returns. In her 2006 tax return, she claimed only her daughter as a dependent. In all of the Debtor's tax returns submitted into evidence, from 2004-2006, the Debtor indicates her address is the Key West Property address.

Since filing her bankruptcy petition, the Debtor has continued to reside and work in Seal Beach, California, but she has traveled from California to Florida for all examinations and hearings in connection with this case.

## CONCLUSIONS OF LAW

Florida's homestead exemption is found in Article X, § 4 of the Florida Constitution, and provides, in relevant part:

> **§ 4. Homestead; exemptions**
>
> (a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the reality, the following property owned by a natural person:
>
> (1) a homestead, if located outside a municipality, to the extent of one hundred sixty acres of contiguous land and improvements thereon, which shall not be reduced without the owner's consent by reason of subsequent inclusion in a municipality; or if located within a municipality, to the extent of one-half acre of contiguous land, upon which the exemption shall be limited to the residence of the owner or the

owner's family . . .

Fla. Cont. Art. X § 4.

It is settled law in Florida that the constitutional homestead exemption "should be liberally construed in favor of the party claiming the exemption and that the exemption's purpose is to protect and foster the family home." *In re Goode*, 146 B.R. 860, 862 (Bankr. M.D. Fla. 1992). "Thus, the burden is on the objecting party to make a strong showing that the claimant is not entitled to the claimed exemption." *Id.* "The homestead exemption should be liberally construed to effectuate its remedial purpose, but at the same time, the Court must take care to prevent it from becoming an instrument of fraud." *In re Bratty*, 202 B.R. 1008 (Bankr. S.D. Fla. 1996) (citing *Croker v. Croker*, 51 F.2d 11 (5th Cir. 1931)).

"Once property is imbued with homestead status, it remains homestead until it is abandoned." *In re Frederick*, 183 B.R. 968, 971 (Bankr. M.D. Fla. 1995). If a home is abandoned, "it loses its exempt status." *In re Brink*, 162 B.R. 355, 358 (Bankr. M.D. Fla. 1993). As the court in *In re Klaiber*, 265 B.R. 290, 293 (Bankr. M.D. Fla. 2001) noted, "[d]ebtors seldom admit to abandonment." A homestead is abandoned when it no longer serves as the owner's "bona fide home and place of permanent [residence]." *Id.*

The Florida Supreme Court has held that "[t]he mere intention, at some future day, to repair and occupy [property claimed as homestead], where such intention is not manifested by acts as well as words, is not sufficient." *Semple v. Semple,* 89 So. 638, 639 (Fla. 1921). "The Debtor's expression of his intention is probative, but if an owner acts inconsistently with a self-professed intention to establish homestead, a claim for exemption may fail." *In re Bratty*, 202 B.R. at 1010.

Based upon the facts herein stated, the Court believes the Debtor never intended to abandon

her homestead interest in the Key West Property, and Debtor's actions are consistent with her intent to keep the Key West Property as her homestead. She came and went to Florida while living in California, for the purpose of fixing up the Key West Property, keeping it in liveable condition and leasing the property in her absence. The Debtor worked on fixing up the Key West Property both before and after Hurricane Wilma. Although she placed the property on the market for sale after the hurricane, she never did sell the property and continued to tend to its condition and maintenance. In fact, as she testified, the reason she moved from Key West back to California was because it was easier for her to make a living in California than it was in Key West. From the testimony and evidence, it is clear the Debtor considers her homestead to be in Florida, in Key West, at the Key West Property.

Although she moved to California to pursue a romantic relationship, the Debtor never did establish a permanent residence in California. When the relationship ended, the Debtor moved in with her mother and thereafter with friends. She is now living with her family in a rented duplex on a month to month basis. This Court has previously held that a "'temporary absence of an owner for reasons of health, *business or recreation* from his residence and the temporary rental of his home during this absence do not necessarily demonstrate an intent to abandon the premises.'" (Emphasis added.) *In re Betancourt*, 154 B.R. 90, 92 (Bankr. S.D. Fla. 1993) citing *In re Shillinglaw*, 81 B.R. 138 (Bankr. S.D. Fla. 1987). This Debtor has not established a "domicile" at some other place, to the exclusion of the Key West Property. She did not buy a new homestead in California, choosing instead to live with others in their homes. The Court does not believe that the evidence proves the Debtor intended to abandon the Key West Property and forsake the Florida homestead for one in California.

The only open issue remaining from the testimony provided and evidence presented at the hearing is whether the Debtor otherwise alienated the homestead in a manner provided by law. *Id.* citing *M.O. Logue Sod Service, Inc. v. Logue*, 422 So. 2d 71, 72 (Fla. 2nd DCA 1982). Specifically, the Court was concerned about the legal implications arising from the Debtor obtaining a California driver's license and registering to vote in California. At the conclusion of the evidentiary hearing, the Court requested post-hearing memoranda addressing this issue. The Court, having reviewed the parties' submissions and having considered the case law with respect to the issue, determines that the Debtor did not alienate her homestead rights in Florida by obtaining a California driver's license or a voter registration in California.

The movant, Michael Mabe, relies on several cases to support his position. The Court has considered the cases cited and finds them to be inapposite to the issue before the Court. Although the movant cites *Herron v. Passailaigue*, 110 So. 539 (Fla. 1926) for the proposition that the term "residence," "residing," or equivalent terms, when used in statutes relating to the right to vote, are used in the sense of "legal residence," the Court does not find this case dispositive of the issue of abandonment of the homestead. The Court is not dealing with any statutory terms. The *Herron* case involved divorce proceedings and the issue presented to that court was whether the petitioner for divorce had established her domicile in Louisiana to enable her to proceed jurisdictionally in Louisiana state court. The court's reasoning is inapplicable to the interpretation of homestead as used in the Florida Constitution.

Movant's reliance on *Murphy v. Farquhar*, 22 So. 681 (Fla. 1897) is also misplaced. In *Murphy*, the Florida Supreme Court ruled that judgment debtors may be deemed to have abandoned their homestead interest in property when they move to another location and register to vote in that

9

new location. However, in *Murphy*, the Supreme Court did not rely solely on the fact the debtor registered to vote in the new town where he moved. Apparently, the debtor "dismantled and deserted" his former homestead. *Id.* at 360. He took part as a registered voter of the new town of Tarpon Springs in the proceedings for its incorporation, and participated as a voter of the town in its town elections during the time that he and his wife resided and kept house there. *Id.* He even exercised the office, part of the time, of town marshal for Tarpon Springs. The Court noted that debtor's visits to his former home, after leaving to Tarpon Springs, were of a "desultory character," and his attempt to transfer legal title of the former homestead to his wife, prior to leaving town, gave "to the transaction the appearance of preconceived preparation upon his part for such removal and abandonment, by substituting the attempted separate ownership of the property by his wife as a bulwark against the claims of his creditors, in lieu of the constitutional shield of his homestead right therein, that he knew would become forfeited upon his contemplated abandonment." The Court finds the *Murphy* case unpersuasive and inapplicable under the circumstances herein.

"Permanent residence is wherever a person mentally intends to be and which can be factually supported. Such factual support may be voter registration, driver's license, tax receipts, receipt of mail, carrying on of activities normally indicative of home life." *See Locational Residency Requirement for an Elector in Florida*, Op. Dept. Elect. 78-27 (June 2, 1978). The movant cites *Penn Mut. Life Ins. Co. v. Fields*, 81 F. Supp. 54, 59 (S.D. Cal. 1948) to support the contention that the Debtor herein intended, by her actions, to permanently reside in California. The Court disagrees.

In *Fields*, the named beneficiaries under an insurance policy argued that the insured, W.C. Fields, was not a permanent resident of California and was not therefore subject to California's community property laws. The named beneficiaries argued that Mr. Field's wife was not entitled

to her share of the policy as community property under California laws as Mr. Fields was permanently domiciled in New Jersey at the time the policy was purchased and that such domicile continued until 1937. The evidence introduced at the trial was contradictory. The beneficiaries testified that the deceased always intended to reside in New Jersey,[1] while other evidence indicated that, on multiple occasions and in writing, W.C. Fields stated his intention as early as 1931 to take up residence in California and to remain there permanently.

The *Fields* court stated:

> In sum, against the fact of residence and declarations of permanency of the type just referred to, we have merely the claim in the tax returns and the unexecuted intention expressed to his brother, sister, secretary and agent, of returning some time to this one-room residence in New Jersey, made at times when all his professional and other activities implying permanency were carried on in California. Such unexecuted intentions cannot overcome the force of facts of this character.

The court noted that "the actualities should prevail over wishful longings, however impelled." The Court was convinced that W.C. Fields intended to reside in California and to remain there permanently since 1931. In the case *sub judice*, the Debtor never admitted to permanently remaining

---

[1] One of the named beneficiaries, Walter Fields, testified that, during the lifetime of their mother, W.C. Fields claimed Philadelphia, where she resided, as his home. After her death in 1925, W.C. Fields told him that he wished to make his permanent home with him at Waterford Works, New Jersey in the house built by Walter Fields in 1919, and occupied by him ever since. A room was set aside in this house for W.C. Fields and his clothes and some boxed books were moved into it. Occasionally, when he played in nearby towns, he would occupy this room on weekend visits or between shows. W.C. Fields came to California in 1931. The brother testified that about 1937, in a letter which had been lost, he disclosed to him, for the first time, his intention to remain in California, by writing that (in the brother's paraphrase of the language) 'It is the nearest place to Heaven that he had ever seen'. His clothes were sent to him in California in 1937, and later, in 1938, two boxes of books were sent, freight receipts for which were produced. The sister, Adel C. Smith, testified to W. C. Fields' expressed desire to make his brother's home his residence, after the mother's death, and to the sending of the clothes and books in 1938. His secretary heard no expression of intention to change the permanent legal residence until 1938, his agent not until 1939. The accountants who prepared the income tax returns were instructed to give New Jersey as the legal residence for the 1931 return. These instructions were not changed until 1937.

in California and none of her actions indicated she was permanently remaining there. As previously stated, the Debtor went to California to pursue a personal relationship. She told her friends she was not intending to give up her residency in Key West. She testified it was also easier for her to earn a living in California. While she was in California, she frequently visited the Key West Property for the purpose of maintaining it. These actions are not actions reflecting an intent to abandon property.

The Court finds that the case of *In re Detko*, 290 B.R. 494 (Bankr. D.Vt. 2003) is directly on point and addresses the issue before the Court. In *Detko*, a Chapter 7 debtor moved to avoid a judicial lien as impairing her homestead exemption. 290 B.R. at 494. The lienholder objected to the debtor's homestead exemption on the basis of abandonment. The *Detko* court held that under state law, the debtor's extended stay out-of-state was not in the nature of abandonment of homestead rights in property. Debtor Detko moved in with her sister out-of-state for a period of six months, pre-petition. *Id.* at 499. During that time, she listed her homestead real property in Vermont for sale, removed her family's personal belongings from the property, enrolled her son in school out-of-state, registered to vote out-of-state, titled and registered one of her vehicles out-of-state, applied for an out-of-state driver's license and surrendered her Vermont driver's license. *Id.* The debtor eventually sold the homestead, pre-petition, then returned to Vermont and, upon filing her Chapter 7 case, claimed the proceeds of the sale as exempt pursuant to the homestead exemption. *Id.* At the evidentiary hearing, the court heard testimony by the debtor and several witnesses, indicating the debtor moved away from the homestead because of her former spouse's drinking addiction, which made her life difficult. *Id.* She decided to move out-of-state at that time to "recuperate from a lot of things going on." *Id.*

The court in *Detko* recognized that the purpose of the Vermont homestead exemption is to

preserve a home for the family and to protect the family unit, and emphasized that to destroy one's homestead status, the objecting party must prove the debtor had the intent to abandon the real property and intent to abandon must be determined by the surrounding facts. *Id.* The *Detko* court made a determination that despite the aforementioned facts, the totality of the testimony presented suggests that the debtor did not abandon her homestead. *Id.* at 500. Specifically, the court determined that while an out-of-state driver's license can weigh in favor of a finding that the debtor abandoned her homestead, the debtor's testimony that her sole purpose of obtaining an out-of-state driver's license was to facilitate her ability to write and cash checks in that state seemed logical and convincing. *Id.* Furthermore, the court was likewise convinced that the debtor had no intention to establish residency out-of-state when registering to vote in that state. *Id.*

In the instant case, the Debtor had a California driver's license issued to her pre-petition, but she never surrendered her Florida driver's license, having initially obtained the license in about 1996. The Debtor testified that she did not renew her California driver's license; but, the evidence indicates that she continuously renewed her Florida driver's license, and she currently possesses a valid Florida driver's license with the renewal issue date of October 14, 2005. The Debtor obtained a California voter's registration card pre-petition, but she testified she also still has a Florida voter's registration card. The Debtor's California voter's registration card has since been canceled, and the Debtor's only active and valid voter's registration card remains in Florida, the state where the Debtor's homestead real property is located.

From the aforementioned facts and case law, the Court concludes that the Debtor did not intend to abandon her homestead, the Key West Property. Creditor, Michael Mabe, has not met his burden of proving that the Debtor, Patricia Lloyd, abandoned her Florida homestead simply because

13

she, at one time, possessed a California driver's license and California voter's registration card. There is no law specifically finding that the issuance of a voter's registration card or driver's license is dispositive of the issue of permanent residency. Thus, it is

**ORDERED AND ADJUDGED** that Creditor Michael Mabe's Objection to Exemption, and the Trustee's Objection to Exemption are OVERRULED, and the Debtor's claim of exemption on the property located at 47 Riviera Drive, Key West, Florida is allowed.

###

Copies furnished to:

Adrian Delancy, Esq.
Leticia Piloto, Esq.